UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TRUSTEES OF THE SHEET METAL WORKERS LOCAL UNION NO. 20 WELFARE AND BENEFIT FUND, et al., | )<br>)<br>) |
| Plaintiffs, | )<br>)<br>) |
| v. | ) No. 1:20-cv-01188-MJD-SEB |
| ROGERS MECHANICAL, INC., | )<br>)<br>) |
| Defendant. | ) |

**ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is Plaintiffs' motion for summary judgment pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") and the Labor Management Relations Act of 1947 ("LMRA") [Dkt. 36]. The motion is fully briefed and the Court, being duly advised, **GRANTS** Plaintiffs' motion for the reasons set forth below.[1]

**I. LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable

---

[1] The Court notes that Plaintiffs filed their reply brief [Dkt. 42] late. However, given that Defendant neither objected to the late filing, nor filed a surreply in response thereto, the Court exercised its discretion and considered the late brief.

inferences must be drawn in the non-movant's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").  Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The facts of record, viewed in the light most favorable to the non-moving party, Defendant, are as follow.

"Plaintiffs are the Trustees of the Sheet Metal Workers Local Union No. 20 Welfare and Benefit Fund, Trustees of the Sheet Metal Workers Local Union No. 20, Indianapolis Area, Pension Trust, and Trustees of the Sheet Metal Workers Local Union No. 20 Defined Contribution Pension Fund (collectively, "the Funds")." [Dkt. 1 at 1.]  Defendant Rogers Mechanical, Inc. "is a full service, licensed mechanical contracting company that provides mechanical, electrical, and plumbing services ("MEP") in the commercial, industrial, multi-family, and higher education industries throughout Central Indiana."  [Dkt. 39 at 1.]

On October 22, 2018, Defendant entered into a subcontract to perform MEP work at the Ford Building located at 1301 East Washington Street, in Indianapolis, Indiana.  *Id.* at 2.  Due to a need to increase its workforce, Defendant, a historically non-union employer, engaged in negotiations with the International Association of Sheet Metal, Air, Rail, and Transportation Workers Local Union No. 20 ("the Union") in the hopes of securing additional workers.  *Id.*

On January 7, 2019, the Union and Defendant entered into a "Project Stipulation Agreement" which provides, in relevant part,

> Hereinafter, "Project" is entered into for the provisions of competent employees by the Union and to Employer pursuant to the terms of the Agreement attached hereto as Exhibit A, ("Local Agreement") as amended below except that the terms and conditions thereof shall be in effect as between Union and Employer.
>
> Union and Employer further agree to the following amendments to the Local Agreement, which shall supersede such Local Agreement notwithstanding provisions therein to the contrary.
>
> 1. The Parties agree that the geographical area covered by this Agreement shall be the Project site.
>
> 2. The parties agree that this Project Stipulation Agreement shall terminate without notice by or to either party upon the completion of Employer's work on the Project.

[Dkt. 1-7 at 1.] Incorporated by reference, the Local Agreement provides, in pertinent part,

### ARTICLE I

> **SECTION 1.** This Agreement covers the rates of pay and conditions of employment of all employees of the Employer and owner/members engaged in but not limited to the (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof and of all HVAC systems, air veyor systems, exhaust systems, and air handling systems regardless of material used including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (c) testing and balancing of all air-handling equipment and duct work; (d) the preparation of all shop and field sketches, whether manually drawn or computer assisted, used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches; (e) metal roofing; and (f) all other work included in the jurisdictional claims of the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART).
>
> See Addendum I.

### ARTICLE II

> **SECTION 1.** No Employer shall subcontract or assign any of the work described herein which is to be performed at a jobsite to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to union security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project.

. . .

### ARTICLE III

**SECTION 1.** The Employer agrees that none but owner/members, journeymen, apprentice, preapprentice, and classified sheet metal workers shall be employed on any work described in Article I, and further, for the purpose of proving jurisdiction, agrees to provide the Union with written evidence of assignment on the Employer's letterhead for certain specified items of work to be performed at a jobsite prior to commencement of work at the site. List of such specific items, which may be revised from time to time, as agreed to by and between SMACNA and SMART, shall be provided to the Employer.

See Addendum III.

[Dkt. 1-8 at 4-5.] The Local Agreement is a collective bargaining agreement ("CBA") in force between the Sheet Metal Contractors Association of Central Indiana, Inc. and the Union. [Dkt. 1-8 at 4.] All employers who become bound by the CBA, become contractually obligated to submit timely reports of hours worked by their employees who are covered by the CBA and make certain contributions to Plaintiffs, the Health, Pension, and DC Funds.[2] [Dkt. 1-8 at 11-12] *see also* [Dkt. 1-1, Dkt. 1-2, Dkt. 1-3, Dkt. 1-4, Dkt. 1-5, Dkt. 1-6]. If a party becomes delinquent in their contribution, they become liable for the costs of collection, attorney fees, interest in the amount of 1.5% from the due date, and liquidated damages in the amount of 15% of the delinquent contributions. [Dkt. 37 at 4]; *see also* [Dkt. 1-4, Dkt. 1-5, Dkt. 1-6.].

Verbally, the parties agreed that the Union would supply Defendant with three union workers to work alongside Defendant and its employees/subcontractors. [Dkt. 38 at 3-4.] Two months after the commencement of the working relationship, Defendant repeatedly complained to the Union that the Union-supplied workers failed to perform up to Defendant's expectations. [*Id.* at 5.] Moreover, "the Union began taking its current position that the Union understood the

---

[2] The Sheet Metal Workers Local Union No. 20 Welfare and Benefit Fund ("Health Fund") provides healthcare benefits to eligible employees. [Dkt. 1-1.] The Sheet Metal Workers Local Union No. 20, Indianapolis Area, Pension Trust ("Pension Fund") provides pension benefits to certain eligible employees and their beneficiaries. [Dkt. 1-2.] The Sheet Metal Workers Local Union No. 20 Defined Contribution Pension Fund ("DC Fund") provides pension benefits to certain eligible employees and their beneficiaries. [Dkt. 1-3.]

Agreement was exclusive and that [Defendant's] non-union employees could not perform any work on the Project that the Union considered Union work." *Id.* at 5.

On April 17, 2020, Plaintiffs filed this lawsuit alleging that Defendant failed its contractual obligation to monthly report "all hours worked by covered employees on the Project and has similarly failed to remit all contribution payments due for the period of January 2019 forward." [Dkt. 1 at 5-6.] Subsequently, Defendant submitted to an audit for work completed at the Project from January 7, 2019, through September 20, 2020. [Dkt. 37 at 4.] The audit concluded that Defendant owes "$146,260.50 in contributions to the Health Fund, $86,358.70 in contributions to the Pension Fund, and $4,486.79 in contributions to the DC Fund, for covered work during the audit period. . . ." Plaintiffs further alleges that, in addition to the delinquent contributions, "Defendant owes $21,858.44 in liquidated damages and $25,519.38 in accrued interest to the Health Fund, $12,906.51 in liquidated damages and $15,065.46 in accrued interest to the Pension Fund, and $610.05 in liquidated damages and $664.07 in accrued interest to the DC Fund." *Id.* at 5. Finally, Plaintiffs alleges that Defendant is responsible for Plaintiffs' legal fees and costs associated with this litigation, in addition to the $4,986.25 Plaintiffs spent on the audit. *Id.*

### III. DISCUSSION

#### A. Liability

Plaintiffs have brought suit against Defendant pursuant to both Section 502 of ERISA, 29 U.S.C. § 1132 and Section 301(a) of the LMRA, 29 U.S.C. 185(a), alleging that Defendant has violated both statutes by failing to make the contributions required by the CBA. Specifically, Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained

5

> agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Defendant contends that it made contributions for all covered employees since its non-union workers are not covered by the contractual agreement. At the heart of this dispute rests an issue of contract interpretation: for which employees was Defendant contractually obligated to make contributions to the plans?

In cases involving an issue of contractual interpretation, "[s]ummary judgment is particularly appropriate." *Murphy v. Keystone Steel & Wire Co*., 61 F.3d 560, 564 (7th Cir. 1995) (citation omitted). Under Indiana law,

> [t]he construction of the terms of a written contract is a pure question of law . . . . When construing the meaning of a contract, our primary task is to determine and effectuate the intent of the parties. First, we must determine whether the language of the contract is ambiguous. The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. If the language of the instrument is unambiguous, the parties' intent will be determined from the four corners of the contract. If, on the other hand, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact finder. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. We do this by examining the language used in the instrument to express their rights and duties. We read the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless. We must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict.

*Whitaker v. Brunner*, 814 N.E.2d 288, 293-94 (Ind. Ct. App. 2004). "Indiana courts zealously defend the freedom to contract. The existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract." *Acheron Med. Supply, LLC v. Cook Inc*., 2017 WL 4310163, at *7 (S.D. Ind. Sept. 28, 2017), *aff'd sub nom. Acheron Med. Supply, LLC v. Cook Med. Inc*., 958 F.3d 637 (7th Cir. 2020) (citations and quotations omitted). Thus, the first step in applying a contract provision is determining whether the provision in question is ambiguous.

"A word or phrase is ambiguous if reasonable people could differ as to its meaning." *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016). A term is not ambiguous solely because the parties disagree about its meaning. *Id.* "'We will not bend the language of a contract to create an ambiguity when none exists, but neither will we follow a literal interpretation when [to do so] would lead to an unreasonable or absurd result.'" *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) (quoting *Chicago Bd. of Options Exch. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir. 1983)). Here there is no ambiguity that the contract covered "**all employees** of the Employer and owner/members." [Dkt. 1-8 at 4] (emphasis added). The contract simply does not recognize a distinction between union and non-union employees.

Defendant attempts to avoid the plain language of the parties' agreement by pointing to extrinsic evidence. Specifically, Defendant points to a series of text messages to show that the Union acknowledge that their union workforce would supplement Defendant's non-union workers. [Dkt. 39 at 1.] However, this "evidence" completely fails to shed any light on the meaning of the phrase "all employees of the Employer and owner/members." [Dkt. 1-8 at 4] If anything, the text messages show that the parties agreed that Defendant would employ both union and non-union workers, something not at issue in this case. The mere fact that Defendant intended to use two types of employees has no bearing on its obligation to contribute to the fund for all of its employees. Defendant also argues that the Union tried to force Defendant into becoming a "Union shop moving forward. " [Dkt. 39 at 5.] Once again, this fact has no bearing on Defendant's obligation under the existing contract that it signed. However, even if Defendant provided compelling evidence, which it did not, because the relevant language of the contract is

7

unambiguous, the Court may not consider extrinsic evidence to arrive at a different interpretation.  *Whitaker*, 814 N.E.2d at 293-94.

Additionally, "[t]he pension or welfare fund is like a holder in due course in commercial law . . . or like the receiver of a failed bank . . . entitled to enforce the writing without regard to understandings or defenses applicable to the original parties." *Cent. States, Se. and Sw. Areas Pension Fund v. Gerber Trucking Serv., Inc.*, 870 F.2d 1148, 1149 (7th Cir. 1989) (citations omitted).  Consequently, Plaintiffs may enforce the express terms of the contract despite any alleged understanding between the Union and Defendant.

Despite Defendant's contentions, this is not a case where a category of employees was not contemplated by a contract.  *See Ind. State Council of Roofers Health & Welfare Fund v. Adams Roofing Co. of Kokomo, Inc.,* 753 F.2d 561, 564 (7th Cir. 1985) (holding that the collective bargaining agreement only covered journeymen or apprentices, not "helpers").  All means all.  Ultimately, if Defendant had intended the contract to refer to only union workers, it should have made those terms explicit through an amendment in the "Project Stipulation Agreement."  *See Empire Realty Invs., Inc. v. U.S. Affordable Hous., LLC*, 2015 WL 2404375, *6 (N.D. Ind., May 19, 2015)* (A court may not "write a new contract for the parties or supply missing terms under the guide of constructing a contract.  Where the subjective intent of the parties is at odds, the text controls.").  Absent such language, the court cannot read an ambiguity into the contract based on Defendant's extrinsic evidence.

Defendant colorfully argues that it only "intended to take the Union for a test drive" and that this case is not a "run-of the mill ERISA collection action arising under a collective bargaining agreement," but is actually "an attempt by [Plaintiffs] to impose nonexistent obligations on a non-union employer by acting as though this case is old hat when it actually a

new hat worn by few to date." [Dkt. 38 at 1-2, 7.]  Unfortunately for Defendant, not only did it fail to read the fine print, it apparently failed to read anything it signed before stepping into the Union car for a test drive.  *See* [Dkt. 39-1 at 5.]  Defendant has provided numerous pieces of irrelevant extrinsic and hearsay evidence in an attempt to read ambiguity into a clear and straightforward contract.  Despite Defendant's alleged intent or understanding, it signed a contract with the Union that covers "**all employees of the Employer and owner/members engaged in but not limited to. . . work included in the jurisdictional claims of the [Union]**." [Dkt. 1-8 at 4.]

Plaintiffs are entitled to summary judgment on the issue of liability for Counts I-IV.

**B.  Damages**

Plaintiffs submit that they are entitled to judgment not only on the question of Defendant's liability, but on the amount of damages as well.  *See* 29 U.S.C. 1132(g)(2).  "Defendant owes the amounts set forth in the audit report, along with related liquidated damages, interest, and audit costs allowed under the relevant collective bargaining agreement, Trust Agreements, and Collection Policies." [Dkt. 37 at 1.]  Specifically, According to Plaintiffs' audit, Defendant is responsible for $318,716.15 in unpaid contributions:

| Fund Name | Contributions | Liquidated Damages | Interest | Total |
|---|---|---|---|---|
| Health Fund | $146,260.50 | $21,858.44 | $25,519.38 | $193,638.32 |
| Pension Fund | $86,358.70 | $12,906.51 | $15,065.46 | $114,330.67 |
| DC Fund | $4,486.79 | $610.05 | $664.07 | $5,760.91 |
| Audit Costs | | | | $4,986.25 |
| Total | | | | $318,716.15 |

9

[Dkt. 37 at 9.] Plaintiffs have identified the Health Fund as the party responsible for paying the $4,986.25 in audit costs to Calibre CPA Group. [Dkt. 48 at 1.]

Defendant finds faults with Plaintiffs' audit for multiple reasons, including:

- The auditor based her calculations on work performed by non-union employees, including the owner of Rogers Mechanical, Inc.

- The auditor based her calculations on work performed by all employees for work not relating to "sheet metal work."

- The auditor included invoices for work conducted at other work sites.

[Dkt. 38 at 7.]

As to Defendant's first argument, as discussed at length above, it was appropriate for the auditor to base her calculations on work performed by non-union employees who worked on the project at the Ford Building for the period covered by the contract. Moreover, the owner's hours are not included in the final audit report. *See* [Dkt. 37-2 at 5] ("[O]n November 12, 2020, the attorney representing Sheet Metal Workers Local 20 Fringe Benefit Funds, Tom Kendall, advised Calibre to remove Trennie Rogers' hours from the report and finalize the audit."). Therefore, Defendant's argument as to the type of employees included in the report fails.

Next, a clear reading of the contract contradicts Defendant's argument that the auditor should have only considered the hours worked for employees doing "sheet metal work." Trennie Rogers' affidavit states that some of Defendant's employees did not perform "sheet metal work," but were instead "providing other work, including, but not limit, tracing copper line sets, to hanging furnaces and duct[s] and cleaning and servicing the ac units themselves." [Dkt. 39 at 7.] However, the local agreement contemplates an extensive amount of work and covers:

> all employees . . . engaged in but not limited to the (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning,

> adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof and of all HVAC systems, air veyor systems, exhaust systems, and air handling systems regardless of material used including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (c) testing and balancing of all air-handling equipment and duct work; (d) the preparation of all shop and field sketches, whether manually drawn or computer assisted, used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches; (e) metal roofing; and (f) all other work included in the jurisdictional claims of the [Union].

[Dkt. 1-8 at 4.] "[I]f a pension or welfare fund has proven that an employer is liable for delinquent contributions, and the employer has failed to keep records that would allow the fund to calculate the precise amount of contributions owed, then the burden shifts to the employer to come forward with evidence of the precise amount of covered work (work covered by the [collective bargaining agreement]) performed by its employees or to come forward with evidence to challenge the accuracy of the fund's calculations." *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 782-83 (7th Cir. 2002). Defendant has simply provided no evidence that the work completed by its non-union employees falls outside the scope of the contract. Nor has Defendant proved, or provided any evidence, that the auditor included work performed by employees at a different project site. Plaintiffs' audit is entitled to a presumption of correctness, and Defendant failed in its burden to rebut that presumption with actual evidence. Therefore, Plaintiffs are entitled to summary judgment on the issue of damages.

For the reasons set forth above, Plaintiffs' motion for summary judgment [Dkt. 36] is **GRANTED**. Judgment will be entered against Defendant in favor of Plaintiffs in the amount of $318,716.15 as follows, with attorneys' fees and costs to be determined by separate order:

- The Sheet Metal Workers Local Union No. 20 Welfare and Benefit Fund: $198,624.57,

- The Sheet Metal Workers Local Union No. 20, Indianapolis Area, Pension Trust: $114,330.67,

- The Sheet Metal Workers Local Union No. 20 Defined Contribution Pension Fund: $5,760.91.

Pursuant to Federal Rule of Civil Procedure 54(d) and Local Rule 54-1, any motion for attorneys' fees and/or bill of costs shall be filed no later than fourteen days from the date judgment is entered.[3]

SO ORDERED.

Dated:  20 MAY 2021

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record
via email generated by the Court's ECF system.

---

[3] The Court notes the untimeliness of Plaintiffs reply brief.  If Plaintiffs seek fees for the reply brief, they should specifically state why those fees should be awarded in spite of the untimeliness of their brief and lack of prior explanation.